# EXHIBIT C

## COPIES OF PLEADINGS

## FILED IN

## DISTRICT OF COLUMBIA

## SUPERIOR COURT

CA Form 1

# Superior Court of the District of Columbia

## CIVIL DIVISION
### 500 Indiana Avenue, N.W., Room JM-170
### Washington, D.C. 20001 Telephone: 879-1133

Emma Cunningham by her
Conservator, Robert Bunn

910 17th Street, NW, Suite 200
Washington, DC 20006
                                        *Plaintiff*

            vs.                                         Civil Action No.
New Century Mortgage Corporation                        05-0005744
18400 Van Karmon Avenue, Suite 1000
Irvine, CA 92612

                                        *Defendant*

Serve:  Chuck Houston, Vice President
        New Century Mortgage Corporation
        18400 Van Karmon Avenue, Suite 1000    **SUMMONS**
        Irvine, CA  92612

To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

                                        *Clerk of the Court*        05 1693

    Robert Bunn, 124677
Name of Plaintiff's Attorney
    910 17th Street, NW
    Suite 200                           By _____  **FILED**
Address Washington, DC  20006                        Deputy Clerk

                                                                     AUG 2 4 2005
    202-293-5553                         Date _____
Telephone                                                NANCY MAYER WHITTINGTON, CLERK
                                                         U.S. DISTRICT COURT

**PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPAÑOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170**

**YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 170**

**NOTE: SEE IMPORTANT INFORMATION ON BACK OF THIS FORM.**

                                                         **EXHIBIT**
                                                            C

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

Emma Cunningham,                                    )
By and Through her Court Appointed                  )
Conservator,                                        )
Robert Bunn, Esq.                                   )
910 17th Street, N.W.                               )
Suite 800                                           )
Washington, D.C.  20006,                            )
                                                    )
Plaintiff                                           )
                                                    )
v.                                                  )     CA No. 05-0005741
                                                    )
                                                    )     Real Property
                                                    )
New Century Mortgage Corporation                    )
18400 Van Karmon Avenue                             )
Suite 1000                                          )
Irvine, CA 92612                                    )
                                                    )
Serve: Chuck Houston, Vice President                )
New Century Mortgage Corporation                    )
18400 Van Karmon Avenue                             )
Suite 1000                                          )
Irvine, CA 92612                                    )
                                                    )
Stephen F.J. Ornstein, Esq.                         )
1700 Pennsylvania Avenue, N.W.                      )
Suite 800                                           )
Washington, D.C.  20006-4704                        )
                                                    )
Serve above                                         )
                                                    )
Saxon Mortgage Services, Inc.                       )
4708 Mercantile Drive North                         )
Ft. Worth, TX 76137-3605                            )
                                                    )
Serve above                                         )
                                                    )
Premier Financial Company                           )
10610 Rhode Island Avenue                           )
Suite 204                                           )
Beltsville, MD 20705                                )
                                                    )

RECEIVED
CIVIL CLERK'S OFFICE
JUL 2 5 2005
SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA
WASHINGTON, DC

Serve above                                    )
                                               )
John Cunningham                                )
6858 West Forest Road                          )
Hyattsville, MD 20785,                         )
                                               )
Serve above                                    )
                                               )
Pinnacle Title and Escrow, Inc.                )
51 Monroe Street                               )
Suite 1505                                     )
Rockville, MD 20850                            )
                                               )
Serve above                                    )
                                               )
Unknown Assignee Lender or                     )
Securitization Trust                           )
                                               )
Defendants                                     )


## COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE, AND OTHER RELIEF

I.      JURISDICTION

        1.      The Court has jurisdiction over this matter pursuant to D.C. Code §11-921.

II.     PARTIES

        1.      (a)     Plaintiff Emma Cunningham ("Plaintiff"), a 92 year old individual, at all

relevant times was the sole owner of 911 Evarts Street, N.E., Washington, D.C. 20018 ("Property")

purportedly until December 28, 2004. She is now the subject of an intervention proceeding in the

Probate Division of the Superior Court (*In Re: Emma Cunningham, Intvp. No. 130-05, D.C. Super.

Ct.*) ("Intervention Case") in which she has been determined to be incapacitated, and unable to

manage her financial, daily living, and health affairs. Intervention Case, Orders docketed June 8,

2005 and June 30, 2005.

2

(b)    A Conservator and Guardian has been appointed for her in that Intervention

Proceeding, the Conservator/Guardian being Robert Bunn, the undersigned. Id. The Conservator

has exclusive jurisdiction over the property of, and claims against, the protected individual under

D.C. Code §21-2066.

2.    Defendant John Cunningham, an individual residing in the District of Columbia, is

the grandson of Emma Cunningham. He lived at the Property until sometime in April, 2005 when

he began to reside at Phoenix House, a drug rehabilitation program, as a condition of his parole

from a prison sentence.

3.    On December 20, 2004, John Cunningham received a no consideration purported

Deed, which was recorded on December 28, 2004 as Document No. 2004175717 among the

District of Columbia Land Records, of a one-half interest as a joint tenant in the Property from

Emma Cunningham ("Deed"). A copy of the Deed is attached as Exhibit A hereto and incorporated

herein by reference.

4.    Defendant New Century Mortgage Corporation ("New Century") is a corporation

that is a residential mortgage lender doing business in the District of Columbia. On December 20,

2004, New Century entered into a $120,000 loan to John Cunningham and received a Note in that

approximate amount on which John Cunningham was the borrower ("Note") secured by a Deed of

Trust on the Property ("Deed of Trust"). The Deed of Trust was recorded as Document No.

2004175718 among the District of Columbia Land Records on December 28, 2004, and was signed

by Emma Cunningham and John Cunningham. A copy of the Deed of Trust is attached hereto as

Exhibit B-1 and a copy of the Note is attached as Exhibit B-2. Exhibits B-1 and B-2 are

3

incorporated herein by reference.

5.      Defendant Saxon Mortgage Services, Inc. ("Saxon"), a corporation doing business in the District of Columbia, is the current holder or servicer of the Note.

6.      Defendant Stephen F.J. Ornstein, Esq. ("Ornstein") is the individual named Trustee in the Deed of Trust.

7.      Defendant Premier Financial Company ("Premier"), a corporation doing business in the District of Columbia, was the loan broker and underwriter for the loan transaction described in Paragraph 5 ("Loan").

8.      Defendant Pinnacle Title and Escrow, Inc. ("Pinnacle"), a corporation doing business in the District of Columbia, conducted the settlement at which the Deed and Deed of Trust were executed. Pinnacle employed an attorney who represented the parties to the settlement at the settlement and supervised the settlement.

9.      Defendant Unknown Lender or Securitization Trust ("Assignee") is the current beneficiary of the Deed of Trust if the initial beneficiary of the Deed of Trust, New Century, or Saxon or any subsequent assignee of the beneficiary's interest has assigned the beneficiary's interest to another lender or securitization trust. If a current holder other than Saxon or New Century exists, that assignee will be added as a defendant upon identification through discovery or other means.

III.    FACTS

1.      On May 4, 2004, Emma Cunningham began consultations with her physician, Dr. Patricia Harris, a gerontologist. From that date, Emma Cunningham has been diagnosed with dementia of the Alzheimer's type. A copy of a letter containing those facts from Dr. Harris is

4

attached as Exhibit C and incorporated herein by reference.

    2.    Dr. Harris was the examiner in the Intervention Case whose Report was a basis of the Court's finding of Mrs. Cunningham's incapacity. The mental disease diagnosed by Dr. Harris has rendered Emma Cunningham, from at least May 4, 2001, incapable of forming the mental elements and capacity necessary to enter into, or understand the ramifications to her and her financial situation of, contracts such as the Note, Deed, Deed of Trust, and any other documents memorializing or securing the Loan (collectively the "Loan Documents").

    3.    Prior to December 20, 2004, Premier and New Century entered into negotiations with John Cunningham for the underwriting and consummation of the Loan. Premier and New Century entered into a scheme with John Cunningham to knowingly, maliciously, intentionally, negligently, and willfully defraud Emma Cunningham of the ownership of the Property, purloin fees and repayments of the Loan from Emma Cunningham, and to purloin the Property from Plaintiff for no consideration.

    4.    Emma Cunningham did not understand the consequences of the Deed, Loan and Loan Documents, and did not have the capacity to enter into them. John Cunningham, New Century, and Premier knew or should have known she lacked such understanding or capacity.

    5.    New Century knew or should have known that Emma Cunningham did not have the requisite mental capacity to enter into a contract, yet contracted the Loan with Emma Cunningham and required her to execute the Loan Documents.

    6.    Premier knew or should have known that Emma Cunningham did not have the requisite mental capacity to enter into a contract, yet contracted the Loan with Emma Cunningham

and required her to execute the Loan Documents.

7.    Premier and New Century knew or should have known that neither John Cunningham or Emma Cunningham had the resources to repay the Loan and that Emma Cunningham did not know she had to repay the Loan.

8.    Prior to December 20, 2004, John Cunningham entered into negotiations with New Century and Premier for the underwriting and consummation of the Loan. John Cunningham, Premier, and New Century entered into a scheme to fraudulently, maliciously, negligently, knowingly, and willfully defraud Emma Cunningham of the ownership of the Property through incurring an indebtedness they knew she could not repay, and which they knew she did not know she had to repay, and deeding a one-half interest in the Property to John Cunningham.

9.    John Cunningham knew or should have known that Emma Cunningham did not have the requisite mental capacity to enter into a contract, yet contracted the Loan and deceived and coerced Emma Cunningham into signing the Loan Documents.

10.    John Cunningham deceived and took advantage of Emma Cunningham's mental incapacity in order to fraudulently acquire a one-half interest in the Property through the Deed, which was given for no consideration.

11.    John Cunningham fraudulently, knowingly, maliciously, and deceptively entered into the Loan transaction in order to obtain the proceeds of the Loan for his own use and not for the use of Emma Cunningham.

12.    Premier and New Century knew or should have known of John Cunningham's intent and Emma Cunningham's inability to understand the consequences of entering into the Loan and

6

the Loan Documents.

13. Saxon knew or should have known when it acquired an interest in the Loan and the Note and Deed of Trust, or contracted to service the Loan Documents, that (i) the Deed, Deed of Trust, Note, and other Loan Documents were fraudulently obtained and that such instruments were invalid and void ab initio because Emma Cunningham had no mental capacity to enter into them and they lacked consideration and (ii) that neither Emma Cunningham or John Cunningham had the resources to repay the Loan and Mrs. Cunningham did not know she had to repay the Loan.

14. Saxon participated in a scheme to fraudulently, maliciously, knowingly, deceptively, and negligently defraud Emma Cunningham of the Property, the Loan proceeds, and of her funds that were used to repay the Loan.

15. Saxon, Premier, and New Century did not take the steps that brokers, underwriters, lenders, and acquirers of Notes should take to ascertain the enforceability of commercial instruments before entering into the Loan, contracting to service the Loan, or acquiring the Loan.

16. Ornstein is the Trustee under the Deed of Trust, and thus, has the power to release the Deed of Trust.

17. John Cunningham has used the proceeds of the Loan for his own purposes and not for the purposes and in the best interests of Emma Cunningham. It is believed by information and belief that John Cunningham may still possess some remainder of the proceeds of the Loan.

18. The Loan is currently alleged to be in default. Emma Cunningham did not have the mental capacity since May 4, 2004 to repay the loan, avoid a default thereon, or understand the consequences of a default.

7

19.    Plaintiff did not receive the actual proceeds of the Loan nor any benefit from the Loan proceeds.    However, (i) Plaintiff's account was fraudulently intended to be used by Defendants, and was fraudulently used by the Defendants, to make payments on the Loan, and (ii) the Property was used as security for the Note which Plaintiff did not sign.

20.    Saxon, New Century, Premier, and John Cunningham knew that neither Emma Cunningham or John Cunningham possessed the resources to repay the Loan and were participants in a scheme to deprive Emma Cunningham of the Property if there was a default in the Loan.

21.    Saxon, New Century, and Premier have fraudulently received fees from Emma Cunningham.

22.    Saxon, New Century, John Cunningham, and Premier knew or should have known that the Deed and Deed of Trust were invalid and void because they lacked consideration, were procured by fraud, and Plaintiff lacked the capacity to execute them.

23.    Pinnacle conducted the settlement of the Loan and Deed and held itself out as acting as the settlement officer for all parties to the Loan and Deed.    The settlement attorney acting for Pinnacle held himself out as acting as the settlement attorney for all parties to the Loan and Deed. A copy of the settlement sheet is attached as Exhibit D and is incorporated herein by reference.

24.    Pinnacle knew or should have known that Emma Cunningham did not have the requisite mental capacity to execute the Loan Documents and Deed.    Pinnacle negligently, fraudulently, and willfully, in violation of its duty to Emma Cunningham, allowed her to execute the Loan Documents and Deed despite her lack of mental capacity.    This failure caused Emma

8

Cunningham to unknowingly incur a $120,000 encumbrance on the Property, to unknowingly convey a one-half interest in the Property to John Cunningham, and to pay fees to the Defendants.

25.    Pinnacle and its attorney had a duty to assure that the Loan Documents and Deed were not fraudulent and did not lack consideration. This duty extended to Plaintiff, a party to the transaction. Pinnacle and its attorney knew or should have known by the exercise of reasonable care that Plaintiff lacked the capacity to sign the Loan Documents and Deed, that there was no consideration for the Deed or Loan Documents signed by Plaintiff, and that the execution by Plaintiff of the Loan Documents and Deed was fraudulently obtained, and thereby breached their duty to not allow Plaintiff not to sign the Loan Documents or Deed.

26.    The transaction entered into between Plaintiff and New Century qualifies as a consumer credit transaction within the meaning of the Truth in Lending Act ("TILA"), 15 U.S.C. §1601, *et seq.*

27.    New Century, in the ordinary course of business, regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments.

28.    New Century is the person to whom the transactions that are the subject of this action were initially payable and is a creditor within the meaning of TILA, 15 U.S.C. §1602(f) and Regulation Z §226.2(a)(17).

29.    The TILA covers closed-end consumer loans secured by residential property. TILA, 15 U.S.C. §1638, 1639; 12 C.F.R. §226.18.

30.    TILA and Regulation Z mandate that all closed-end consumer loans be accompanied

9

by a Truth in Lending disclosure of material terms.

31.    Defendant New Century Mortgage Corporation violated TILA by failing to provide Plaintiff with any of the material disclosures or Notices of Right to Cancel required by TILA.

IV.    REQUESTED RELIEF

A. *COUNT ONE-DECLARATORY RELIEF*

1.    The prior paragraphs are incorporated herein by reference.

2.    The Plaintiff asks that the Deed and Deed of Trust be declared void ab initio for lack of consideration, lack of capacity by Plaintiff, and procurement by fraud.

3.    The Plaintiff requests that the Court declare that the Deed of Trust and Deed are unenforceable for lack of consideration, lack of capacity by Plaintiff, and procurement by fraud.

4.    The Court requests that Emma Cunningham and any and all property in which she has an interest be declared released from all liability under the Loan from the date of execution of the Loan Documents.

B. *COUNT TWO - INJUNCTIVE RELIEF*

1.    The prior paragraphs are hereby incorporated herein by reference.

2.    The Plaintiff requests that the Court appoint a Trustee to sign any and all instruments and documents necessary to transfer title to the Property from John Cunningham and Emma Cunningham as joint tenants to Emma Cunningham as sole owner of the Property.

3.    The Plaintiff requests that Ornstein be ordered and enjoined to sign a release of the Deed of Trust to Emma Cunningham.

4.    The Plaintiff requests that Premier, Ornstein, Saxon, and New Century be ordered

10

and enjoined from taking any action to enforce any purported rights that they claim they may have against Emma Cunningham, against any property in which she owns an interest, or against the Property, under the Deed of Trust, the Note, or any other document codifying, or designed or intended to secure or enforce, the Loan.

5.    The Plaintiff requests that John Cunningham be ordered and enjoined to deliver and transfer to the Conservator any proceeds of the Loan still in the possession of John Cunningham.

6.    The Plaintiff requests that Premier, Ornstein, Saxon, and New Century be ordered and enjoined to submit any claims they may allege to have against Emma Cunningham to the Conservator for Emma Cunningham pursuant to D.C. Code §21-2066, and that each of them is to take no other action to enforce any such claims.

C. *COUNT III – DAMAGES AND COSTS*

1.    The prior paragraphs are hereby incorporated herein by reference.

2.    The Plaintiff requests that the Court order  that the costs of the transfer of title to the Property, of funds,  of releasing the Deed of Trust, and all other transfers ordered by the Court, be at the sole cost and expense of Defendants John Cunningham, Premier, Pinnacle, Saxon, and New Century, jointly and severally.

3.    The Plaintiff requests that the Court award attorneys' fees to the Plaintiff, jointly and severally, against Defendants  John Cunningham, Premier, Pinnacle, Saxon, and New Century because of the fraudulent nature of the actions and inaction of those Defendants.

4.    The Plaintiff requests that the Plaintiff be awarded damages in the amounts of all fees taken from or paid by Emma Cunningham in connection with the Loan as compensatory

11

damages and $250,000 as punitive damages, jointly and severally, against Defendants John Cunningham, Premier, Pinnacle, New Century, and Saxon for the actions of those Defendants in carrying out their aforedescribed scheme to fraudulently, maliciously, knowingly, negligently, and willfully deprive Emma Cunningham of her title to the Property and imposing a $120,000 liability on Mrs. Cunningham secured by the Property which they knew, or should have known, she could not repay and knew, or should have known, she did not know she had to repay.

5.     The Plaintiff requests that the Court award compensatory damages in the amount of $120,000 and punitive damages in the amount of $250,000 against Pinnacle for the violation of its duty to Plaintiff not to allow her to execute the Deed or Loan Documents, which were fraudulent, lacked consideration, and as to which she lacked capacity to sign.

6.     The Plaintiff requests that the Court award compensatory damages in the amount of $120,000 and punitive damages in the amount of $250,000 against Pinnacle for the violation of its duty to Plaintiff to use reasonable care and diligence in order to not to allow her to execute the Deed or Loan Documents, which were fraudulent, lacked consideration, and as to which she lacked capacity to sign.

7.     The Plaintiff requests that the Court order all payments on the Loan made with funds of Emma Cunningham or in which she had an interest be returned to Plaintiff by Defendants Premier, Saxon, and New Century, jointly and severally.

D.  *COUNT IV ---TRUTH IN LENDING ACT VIOLATIONS*

1.     New Century's violations of TILA entitle Plaintiff to rescission as to New Century and any current assignee, under 15 U.S.C. §§1635, as well as statutory damages, costs and attorneys

12

fees pursuant to 15 U.S.C. §1640.

2.    The Plaintiff requests that the Court declare that since New Century, Saxon and the Assignee have violated TILA, the Loan Documents including the Note and Deed of Trust are rescinded.

3.    The Plaintiff requests that the Court order Ornstein, Saxon, New Century and the Assignee to take all necessary actions at the cost, including legal fees, of New Century, Saxon and Assignee to effectuate such rescission.

E.    *COUNT V --- DISTRICT OF COLUMBIA USURY ACT*

1.    New Century's failures to deliver to Plaintiff material disclosures required in connection with the Loan, outlined above, also violates D.C. Code §28-3301(f)(3), entitling Plaintiff to actual and punitive damages and attorneys fees pursuant to D.C. Code §28-3314 ("Usury Act").

2.    The Plaintiff requests that the Court Order that the Loan Documents be rescinded and that actual damages in the amount of $120,000 and punitive damages of $250,000 or such higher amount as allowed by the Usury Act be awarded to Plaintiff.

F.    *COUNT VI --- OTHER RELIEF*

1.    The Plaintiff requests that all relief awarded against Saxon and New Century also be awarded against Assignee.

2.    The Plaintiff requests that the Court award such other relief to Emma Cunningham as the Court deems just and proper.

V.    TRIAL BY JURY

13

1.    The Plaintiff requests a jury trial on the issues triable by jury.

VI.    RESERVATION

The Plaintiff reserves the rights to amend the Complaint to conform to adduced evidence, to add additional defendants, and to add or delete causes of action and requests for relief.

Respectfully submitted,

Robert Bunn, Esq.
D.C. Bar No. 124677
910 17th Street, N.W.
Suite 800
Washington, D.C.  20006-2606
(202) 293-5552
*Conservator for Emma Cunningham*

14

## VERIFICATION

The undersigned hereby affirms that the foregoing facts are true and correct as of the date of signing  to the best of his knowledge, information, and belief.

_Robert Bunn_
Robert Bunn

Subscribed to and sword to before me this _25_ day of _July_, 2005.

_Lorraine Brown_
Notary Public

My commission expires: _July 31, 2007_

15

Doc# 2004175717

AFTER RECORDING RETURN TO:
PINNACLE TITLE AND ESCROW, INC.
51 MONROE STREET #1505
ROCKVILLE, MARYLAND 20850

GIFT DEED

Tax id: Square 3843, Lot 0013
NO TITLE INSURANCE
FEE SIMPLE DEED

PLAINTIFF'S
EXHIBIT
A

**THIS DEED,** made this 20th day of December, 2004, by and between EMMA CUNNINGHAM,

Party of the First Part, and EMMA CUNNINGHAM and JOHN A. CUNNINGHAM, her grandson,

Parties of the Second Part,

WITNESSETH that in consideration of the sum of NO CONSIDERATION, the receipt of which is hereby acknowledged, the said Party of the First Part does hereby grant and convey the Parties of the Second Part, as *as* JOINT TENANTS *and not as tenants in common,* forever, in fee simple, all that lot, tract, piece or parcel of land, situate, lying and being in the District of Columbia and described as follows, that is to say:

Lot 13 in Square 3843 in the subdivision made by Oscar S. Wilkinson and others, of parts of "Metropolis View" as per plat recorded in Liber 79 at folio 6 in the Office of the Surveyor for the District of Columbia. Known for purposes of assessments and taxation as Square 3843, Lot 0013.

Being the same property conveyed to John W. Cunningham and Emma Cunningham as tenants by the entireties by deed dated 12/18/51 and recorded among the Land Records of the District of Columbia in Liber 9637 at folio 374. The said John W. Cunningham departed this life on 3/19/1955 leaving Emma Cunningham as surviving tenant by the entirety.

SUBJECT TO all covenants, easements, restrictions and rights of ways as contained in deeds and instruments forming the chain of title to the subject property.

Together with the buildings and improvements thereupon erected, made or being; and all, and every, the rights, alleys, ways, waters, privileges, appurtenances and advantages to the same belonging or anywise appertaining.

THE PARTIES HERETO CERTIFY UNDER PENALTIES OF PERJURY THAT THE WITHIN CONVEYANCE IS MADE WITHOUT CONSIDERATION AND THAT THE VALUE OF THE PROPERTY IS $133,210.00, ONE HALF OF WHICH IS $66,605.00.

To have and to hold the said land and premises above described and mentioned and hereby intended to be conveyed; together with the rights, privileges, appurtenances and advantages thereto belonging or appertaining unto and to the proper use and benefit of the said Parties of the Second Part, forever, in fee simple.

File No. 04-17821NT
Tax ID LOT 0013, SQUARE 3843

And the said Party of the First Part hereby covenants that he/she will warrant specially the property hereby granted and conveyed, and that he/she will execute such further assurances of said land and premises as may be requisite.

WITNESS the hands and seals of the said grantor:

WITNESS *Rebecca Sorenson*                    Emma Cunningham

STATE OF MARYLAND, MONTGOMERY COUNTY:

I hereby certify that on this 20 day of December, 2004, before me, the subscriber, a Notary Public of the State and County aforesaid, personally appeared Emma Cunningham, and he/she acknowledged the foregoing Deed to be his/her act.

My commission expires:                         NOTARY PUBLIC

File No. 04-17821NT
Tax ID LOT 0013, SQUARE 3843

SCHEDULE ███████ A

Lot 13 in Square 3843 in the subdivision made by Oscar S. Wilkinson and others, of parts of "Metropolis View" as per plat recorded in Liber 79 at folio 6 in the Office of the Surveyor for the District of Columbia.

Being the same property conveyed to John W. Cunningham and Emma Cunningham as tenants by the entireties by deed dated 12/18/51 and recorded among the Land Records of the District of Columbia in Liber 9637 at folio 374. The said John W. Cunningham departed this life on _____ leaving Emma Cunningham as surviving tenant by the entirety.

TAX ID: 3843 0013



Rec# 200417527
Filed & Recorded
12/14/2004  11:45AM
LARRY TODD
RECORDER OF DEEDS
WASH P. RECORDER OF DEEDS
RECORDING                        $    27.00
SURCHARGE                        $     6.50
REGISTRATION TAX FEE             $    72.66
TRANSFER TAX FEE                 $    78.66
    Total                        $ 1,450.82

Title Insurer: Chicago Title Insurance Company

Return To:
~~New Century Mortgage~~
~~Corporation~~
~~18400 Von Karman, Suite 1000~~
~~Irvine, CA 92612~~

TAX ID# 3843 0013
FILE # 04-1782]

...ᴸ, RECORDING RETURN TO:
...NACLE TITLE AND ESCROW, INC.
...  DE STREET #1505
...LE, MARYLAND 20850

PLAINTIFF'S
EXHIBIT
B-1

Tax ID: 5 3843 Lot 0013 [Space Above This Line For Recording Data]
Refinance
# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated December 20, 2004
together with all Riders to this document.

(B) "Borrower" is EMMA CUNNINGHAM and JOHN A. CUNNINGHAM

Borrower's address is 911 EVARTS STREET NE , WASHINGTON, DC 20018
. Borrower is the trustor under this Security Instrument.

(C) "Lender" is New Century Mortgage Corporation

Lender is a Corporation
organized and existing under the laws of California
Lender's address is 18400 Von Karman, Suite 1000, Irvine, CA 92612

Lender is the beneficiary under this Security Instrument.

(D) "Trustee" is Stephen F. J. Ornstein Esq.

Trustee's address is 1700 Pennsylvania, Avenue N.W. Washington, D.C. 2006

1000395478

DISTRICT OF COLUMBIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3009

-6(DC) (0205) 01        1/01 (rev. 5/02)
Page 1 of 15          Initials: JAC
VMP MORTGAGE FORMS  (800)521-7291
EjC

Doc# 2004175718

(E) "Note" means the promissory note signed by Borrower and dated December 20, 2004
The Note states that Borrower owes Lender ONE HUNDRED TWENTY THOUSAND AND 00/100
                                                                            Dollars
(U.S. $120,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than January 1, 2035

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider   [ ] Condominium Rider              [ ] Second Home Rider
[ ] Balloon Rider           [ ] Planned Unit Development Rider [ ] 1-4 Family Rider
[ ] VA Rider                [ ] Biweekly Payment Rider         [X] Other(s) [specify]
                                                               Prepayment Rider
                                                               ARM Rider Addendum

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used

                                                                            1000395478
-6(DC) (0205) 01            Page 2 of 16        Initials:        Form 3009 1/01 (rev. 5/02)



in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

### TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the District of Columbia: See Legal Description Attached Hereto and Made a Part Hereof

*See attached schedule A.*

Parcel ID Number: SQUARE 3843 LOT 13                                 which currently has the address of
911 EVARTS STREET NE                                                              [Street]
Washington, District of Columbia 20018        [Zip Code]  ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

1000395478

-6(DC) (0205).01                        Page 3 of 16                        Initials: _____
                                                                                      Form 3009  1/01 (rev. 5/02)

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payment are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's

1000395478

obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien

which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance

1000395478

-6(DC) (0206) 01                    Page 5 of 15                    Initials ____JQC____
                                                                    ____A.J.C.____ Form 3009 1/01 (rev. 5/02)

proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien

1000395478

Initials: JAC

-6(DC) (0205) 01                              Page 7 of 15                              Form 3009 1/01 (rev. 5/02)

which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

1000395478

-6(DC) (0205) 01                Page 8 of 15          Initials: _SAC_
                                                        _E_ _J_ _C_ Form 3009  1/01 (rev. 5/02)

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

1000395478

Form 3009  1/01 (rev. 5/02)

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the

1000395478

-6(DC) (0205).01                    Page 11 of 15                    Initials: JAC                    Form 3009  1/01 (rev. 5/02)

new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

1000395478

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall send written notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall give notice of sale by public advertisement as Trustee deems proper to protect the interests of Borrower and Lender. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of 5.00 % of the gross sale price and reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by recording a Deed of Appointment. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

-6(DC) (0205) 01                Page 13 of 15                Initials: _____    1000395478
                                                            Form 3009 1/01 (rev. 5/02)

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____ (Seal)
Rebecca Sorenson                 JOHN A. CUNNINGHAM        -Borrower

As to both

                                 911 EVARTS STREET NE
                                 WASHINGTON, DC 20018        (Address)

                                 _____ (Seal)
                                                              -Borrower

                                 _____ (Address)

_____ (Seal)      _____ (Seal)
                      -Borrower   EMMA CUNNINGHAM              -Borrower

_____ (Address)    _____ (Address)

_____ (Seal)      _____ (Seal)
                      -Borrower                               -Borrower

_____ (Address)    _____ (Address)

_____ (Seal)      _____ (Seal)
                      -Borrower                               -Borrower

_____ (Address)    _____ (Address)

                                             1000395478

-6(DC) (0205).01          Page 14 of 15        Form 3009  1/01 (rev. 5/02)

STATE OF MARYLAND , MONTGOMERY COUNTY
~~DISTRICT OF COLUMBIA~~, ss:

I, MICHELLE M. CLARK , a Notary Public in and for the ~~District~~ State
of ~~Columbia~~, do hereby certify that
Maryland

John A. Cunningham and Emma Cunningham

personally known to me as the person(s) who executed the foregoing instrument bearing date of 20th
day of December, 2004 , personally appeared before me in said District and acknowledged said
instrument to be his/her/their act and deed, and that he/she/they executed said instrument for the purposes
therein contained.

Witness my hand and official seal this 20 day of December 2004

_____ (Seal)
Notary Public, D.C.

MICHELLE M. CLARK
... of Maryland
... County
... December 31, 2006

Initials: JAC

1000395478

& t Form 3009  1/01 (rev. 5/02)

# ADJUSTABLE RATE RIDER
**(LIBOR Six-Month Index (As Published in *The Wall Street Journal*) - Rate Caps)**

THIS ADJUSTABLE RATE RIDER is made this 20th    day of December, 2004    ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
New Century Mortgage Corporation

("Lender") of the same date and covering the property described in the Security Instrument
and located at: 911 EVARTS STREET NE, Washington, DC  20018

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME
AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:
**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of        7.750 %. The Note provides
for changes in the interest rate and the monthly payments, as follows:
**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The interest rate I will pay may change on the first day of January, 2007        ,
and on that day every 6th        month thereafter. Each date on which my interest rate
could change is called a "Change Date."
(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The
"Index" is the average of interbank offered rates for six month U.S. dollar-denominated
deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most
recent Index figure available as of the first business day of the month immediately preceding
the month in which the Change Date occurs is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based
upon comparable information. The Note Holder will give me notice of this choice.
(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding
Five                                                                percentage points
(    5.000 %) to the Current Index. The Note Holder will then round the result of
                                                                1000395478

**MULTISTATE ADJUSTABLE RATE RIDER - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN
THE WALL STREET JOURNAL)** - Single Family - Fannie Mae Uniform Instrument
VMP-838R (0402)  Form 3138 1/01
Page 1 of 3        Initials: _____
VMP Mortgage Solutions, Inc.
(800)521-7291

this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 9.250 % or less than 7.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One And One-half percentage points ( 1.500 %) from the rate of interest I have been paying for the preceding G months. My interest rate will never be greater than 14.750 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

1000395478

-838R (0402)                    Page 2 of 3              Initials: _____    Form 3138 1/01

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)                    _____ (Seal)
JOHN A. CUNNINGHAM        -Borrower                                        -Borrower

_____ (Seal)                    _____ (Seal)
Emma Cunningham           -Borrower                                        -Borrower

_____ (Seal)                    _____ (Seal)
                          -Borrower                                        -Borrower

_____ (Seal)                    _____ (Seal)
                          -Borrower                                        -Borrower

1000395478

-838R (0402)                    Page 3 of 3                    Form 3138 1/01

# ADJUSTABLE RATE RIDER ADDENDUM
(Libor Index - Rate Caps)

This Adjustable Rate Rider Addendum is made this **20th** day of **December** **2004** , and is incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and Mortgage, Deed of Trust or Security Deed (the "Security Instrument") and Adjustable Rate Rider (the "Rider") of the same date given by the undersigned (the "Borrower") to secure repayment of Borrower's Note to

**New Century Mortgage Corporation**                                                 (the "Lender").

Property securing repayment of the Note is described in the Security Instrument and located at:

**911 EVARTS STREET NE, Washington, DC 20018**
(Property Address)

To the extent that the provisions of this Adjustable Rate Rider Addendum are inconsistent with the provisions of the Note and/or Security Instrument and/or Rider, the provisions of this Addendum shall prevail over and supersede any such inconsistent provisions of the Note and/or Security Instrument and/or Rider.

In addition to the covenants and agreements made in the Note, Security Instrument, and Rider, Borrower and Lender further covenant and agree as follows:

**4.     (D) LIMITS ON INTEREST RATE CHANGES**
     The interest rate I am required to pay at the first change date will not be greater than           **9.250** % or less than                    **7.750** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One And One-half**                    percentage point(s) (                    **1.500** %) from the rate of interest I have been paying for the preceding   **6**   months. My interest rate will never be greater than             **14.750** % or less than                   **7.750** %.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider Addendum.

_____                    _____
**JOHN A. CUNNINGHAM**                                          *Emma Cunningham*

_____                    _____

_____                    _____

_____                    _____

NCMC
Adjustable Rate Rider Addendum
RE-102   (082296)                                Page 1 of 1                                          **1000395478**

## PREPAYMENT RIDER
## ADJUSTABLE RATE LOAN

This prepayment Rider is made this 20th   day of **December**   , **2004**   . and is
incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and
Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure repayment of Borrower's Note to

**New Century Mortgage Corporation**                                          (the "Lender").

To the extent that the provisions of this Prepayment Rider are consistent with the provisions of the Note
and/or Security Instrument, the provisions of this rider shall prevail over and shall supersede any such
inconsistent provisions of the Note and/or Security Instrument.

In addition the covenants and agreements made in the Note and Security Instrument, the Borrower and
Lender further covenant and agree as follows:

**5. BORROWER'S RIGHT TO PREPAY**
        I have the right to make prepayments of principal any time before they are due. A payment of
principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in
writing I am doing so. The Note Holder will use all of my prepayments to reduce the amount of
principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the
due dates of my monthly payments unless the Note Holder agrees in writing to those changes.

        If within  2  year(s) from the due date of the execution of the Security Instrument, I make a full
prepayment or, in certain cases a partial prepayment, and the total of such prepayment(s) in any 12
month period exceeds ONE THIRD (1/3) of the original principal amount of this loan, I will pay a
prepayment charge in an amount equal to the payment of 2 months advance interest on the amount by
which the total of my prepayment(s) within that 12 month period exceeds ONE THIRD (1/3) of the
original principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Prepayment Rider.

**JOHN A. CUNNINGHAM**                        Emma   Cunningham

---

---

---

## SCHEDULE A

Lot 13 in Square 3843 in the subdivision made by Oscar S. Wilkinson and others, of parts of "Metropolis View" as per plat recorded in Liber 79 at folio 6 in the Office of the Surveyor for the District of Columbia. Known for purposes of assessments and taxation as Square 3843, Lot 0013.

Being the same property conveyed to John W. Cunningham and Emma Cunningham as tenants by the entireties by deed dated 12/18/51 and recorded among the Land Records of the District of Columbia in Liber 9637 at folio 374.

**SECURITY AFFIDAVIT**
**CLASS 1 and CLASS 2**

I (We), **Emma Cunningham and John A. Cunningham,** the owner(s) of the real property described within, certify, subject to criminal penalties for making false statements pursuant to Section 404 of the District of Columbia Theft and White Collar Crimes Act of 1982, effective December 1, 1982 (D.C. Law 4-164; D.C. Code 22-2514), that the real property described within is either Class 1 Property or Class 2 Property, as those classes of property are established pursuant to Section 412a of the District of Columbia Real Property Tax Revision Act of 1974, approved September 3, 1974 (88 Stat. 1051 D.C. Code 47-S13), with 5 or fewer units.

(signature)

**Emma Cunningham**

(signature)

**John A. Cunningham**

State of Maryland County of Montgomery

Subscribed and sworn to before me this **20th day of December, 2004**

**Notary Public**

My commission expires:

Our Case: 04-17821NT

R TO DEED OF TRUST

I/We the undersigned, the owner(s) of the real property described within, certify, subject to criminal penalties for making false statements pursuant to Section 404 of the District of Columbia Theft and White Collar Crimes Act of 1982, effective December 1, 1982 (D.C. Law 4-164; D.C. Code 22-2514), that the real property described within is either Class 1 Property or Class 2 Property as those classes of property are established pursuant to Section 412a of the District of Columbia Real Property Tax Revision Act of 1974, approved September 3, 1974 (88 Stat. 1051 D.C. Code 47-813), with 5 or fewer units contained on the property. According to the Code's provision, a person commits the offense of making false statements if that person wilfully makes a false statement that is in fact material, in writing, directly or indirectly, to any instrumentality of the District of Columbia government, under circumstances in which the statement could reasonably be expected to be relied upon as true, provided, that the writing indicates that the making of a false statement is punishable by criminal penalties. Any person convicted of making false statements shall be fined not more than $1,000 or imprisoned for not more than 1 year, or both.

Dated and effective this day of December 20, 2004

_____ SEAL
Emma Cunningham

_____ SEAL
John A. Cunningham

Montgomery County, Maryland

I, Michelle M. Clark _____, a Notary Public in and for the jurisdiction aforesaid do hereby certify that Emma Cunningham and John A. Cunningham party(ies) to the within instrument bearing date on December 20, 2004 and hereto annexed, personally appeared before me in said jurisdiction being personally well known to me as the person(s) who executed the said instrument and acknowledged the same to be his/her/their/its act and deed.

Given under my hand and seal this December 20, 2004.

_____
Notary Public

My commission expires:

MICHELE M CLARK
Maryland
Notary
04.21.23

**TO BE PRINTED OR TYPED**
Names address of all parties to the instrument being recorded

Debtor #1 Name: Emma Cunningham
Debtor #1 Address: 911 Evarts Street, Washington, DC 20018

Debtor #2 Name: John A. Cunningham
Debtor #1 Address: 911 Evarts Street, Washington, DC 20018

Trustee(s) Name(s): Stephen F. J. Ornstein, Esq.

Trustee(s) Address: 1700 Pennsylvania Ave. NW.
Washington, D.C. 20006

Beneficiary's Name: New Century Mortgage Corp.

Beneficiary's Address: 18400 Von Karman, Ste 1000
Irvine, CA 92612



Doc# 2004175718
Filed & Recorded
12/28/2004    11:45AM
LARRY TODD
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS
RECORDING        $        167.00
SURCHARGE        $          6.50
Total:           $        173.50



PLAINTIFF'S
EXHIBIT
B-2

## ADJUSTABLE RATE NOTE
### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

December 20, 2004              Washington              District Of Columbia
[Date]                              [City]                        [State]

911 EVARTS STREET NE, Washington, DC 20018
[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $120,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is New Century Mortgage Corporation

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 7.750 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on February 1, 2005 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on January 1, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 18400 Von Karman, Suite 1000 Irvine, CA 92612

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $859.70 . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

1000395478

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) -
Single Family - Fannie Mae UNIFORM INSTRUMENT

-838N (0210)          Form 3520 1/01

VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 4          Initials:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of January, 2007                    , and on that day every
6th         month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of
interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in
*The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately
preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable
information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Five
                                        percentage points (                    5.000 %) to the Current
Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point
(0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next
Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid
principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially
equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than                    9.250 %
or less than         7.750 %. Thereafter, my interest rate will never be increased or decreased on any single
Change Date by more than One And One-half              percentage point(s) (         1.500 %)
from the rate of interest I have been paying for the preceding 6          months. My interest rate will never be greater
than          14.750 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment
beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly
payment before the effective date of any change. The notice will include information required by law to be given to me and
also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known
as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not
designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will
use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the
Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly
payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my
monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial
Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or
other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such
loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already
collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund
by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the
reduction will be treated as a partial Prepayment.

1000395478

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

1000395478

Form 3520 1/01
Initials: ___

-S38N (0210)                            Page 3 of 4

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
JOHN A. CUNNINGHAM                -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

[Sign Original Only]

1000395478

-838N (0210)                  Page 4 of 4                  Form 3520 1/01



**PLAINTIFF'S
EXHIBIT
C**

Patricia F. Harris, MD
*Faculty*



# Washington
# Hospital Center

Geriatrics and Long Term Care

June 14, 2005

Robert Bunn, Esq
910 17th Street NW, Suite 800
Washington DC  20036

RE:  Emma Cunningham

Dear Mr. Bunn.

I am a board certified physician, specializing in geriatrics, and licensed in Washington, DC. Emma Cunningham has been my patient since May 4, 2004. I and my nurse practitioner colleagues have seen her approximately every three weeks since that time.

At the time of my first meeting of Mrs. Cunningham, she exhibited signs of moderate-to-severe dementia. She was unable to tell me her medical history. She neglected to take any medications. She did not recall her profession, and was unable to give me any details regarding her financial status.

I believe she has a mixed dementia, both vascular and of the Alzheimer's type.

Please do not hesitate to contact me should you need further information.

Sincerely,

*Patricia Harris*

Patricia Harris, MD MS

*MedStar Health*

110 Irving Street, NW, Room 2B-39, Washington, DC 20010-2975
*phone:* 202 877 0218 • *fax:* 202 877 0544 • *e mail:* patricia.f.harris@medstar.net

PLAINTIFF'S
EXHIBIT
D

A. **Settlement Statement**

U.S. Department of Housing and Urban Development
OMB No. 2502-0265 REV. HUD-1 (3/86)

B. Type of Loan

| 1. ☐ FHA | 2. ☐ FmHA | 3. ☐ Conv. Unins. | 6. File Number | 7. Loan Number | 8. Mortgage Insurance Case Number |
|---|---|---|---|---|---|
| 4. ☐ VA | 5. ☐ Conv. Ins. | | 04-17821NT | 1000395478 | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for information purposes and are not included in the totals. WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

TitleExpress Settlement System
Printed 12/20/2004 at 10:21 SD

| D. NAME OF BORROWER: | Emma Cunningham and John A. Cunningham |
|---|---|
| ADDRESS: | 911 Evarts Street, Washington, DC 20018 |
| E. NAME OF SELLER: | R E F I N A N C E |
| ADDRESS: | |
| F. NAME OF LENDER: | New Century Mortgage Corporation |
| ADDRESS: | 11730 Plaza America Drive, #650, Reston, VA 20190 |
| G. PROPERTY ADDRESS: | 911 Evarts Street, Washington, DC 20018 |
| H. SETTLEMENT AGENT: | Pinnacle Title and Escrow Inc., Phone: 301-424-5400 FAX: 301-424-6896 |
| PLACE OF SETTLEMENT: | 51 Monroe Street, Suite 1505, Rockville, MD 20850 |
| I. SETTLEMENT DATE: | 12/20/2004    DISBURSEMENT DATE:    12/27/2004 |

| J. SUMMARY OF BORROWER'S TRANSACTION: | | | K. SUMMARY OF SELLER'S TRANSACTION: | | |
|---|---|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER | | | 400. GROSS AMOUNT DUE TO SELLER: | | |
| 101. Contract sales price | | | 401. Contract sales price | | |
| 102. Personal Property | | | 402. Personal Property | | |
| 103. Settlement charges to borrower (line 1400) | 36,385.37 | | 403. | | |
| 104. | | | 404. | | |
| 105. | | | 405. | | |
| Adjustments for items paid by seller in advance | | | Adjustments for items paid by seller in advance | | |
| 109. | | | 409. | | |
| 110. | | | 410. | | |
| 111. | | | 411. | | |
| 112. | | | 412. | | |
| 120. GROSS AMOUNT DUE FROM BORROWER | 36,385.37 | | 420. GROSS AMOUNT DUE TO SELLER: | | |
| 200. AMOUNTS PAID BY OR ON BEHALF OF BORROWER | | | 500. REDUCTIONS IN AMOUNT DUE TO SELLER | | |
| 201. Deposit or earnest money | | | 501. Excess Deposit (see instructions) | | |
| 202. Principal amount of new loans | 120,000.00 | | 502. Settlement charges to seller (line 1400) | | |
| 203. Existing loan(s) taken subject to | | | 503. Existing loan(s) taken subject to | | |
| 204. | | | 504. | | |
| 205. | | | 505. | | |
| 206. | | | 506. | | |
| 207. | | | 507. | | |
| 208. | | | 508. | | |
| 209. | | | 509. | | |
| Adjustments for items unpaid by seller | | | Adjustments for items unpaid by seller | | |
| 213. | | | 513. | | |
| 214. | | | 514. | | |
| 215. | | | 515. | | |
| 216. | | | 516. | | |
| 217. | | | 517. | | |
| 218. | | | 518. | | |
| 219. | | | 519. | | |
| 220. TOTAL PAID BY/FOR BORROWER | 120,000.00 | | 520. TOTAL REDUCTION AMOUNT DUE SELLER | | |
| 300. CASH AT SETTLEMENT FROM OR TO BORROWER | | | 600. CASH AT SETTLEMENT TO OR FROM SELLER | | |
| 301. Gross amount due from borrower (line 120) | 36,385.37 | | 601. Gross amount due to seller (line 420) | | |
| 302. Less amounts paid by/for borrower (line 220) | 120,000.00 | | 602. Less reduction amount due seller (line 520) | | |
| 303. CASH TO BORROWER | 83,614.63 | | 603. CASH TO SELLER | | 0.00 |

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT  File Number: 0  821   PAGE 2
SETTLEMENT STATEMENT  EV HUD-1 (3/86)  TitleExpress Settlement System Printed 12/20/2004 at 10:21 SD

| L. SETTLEMENT CHARGES | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|
| 700. TOTAL SALES/BROKER'S COMMISSION based on price $ @ 0.000 = | | |
| Division of commission (line 700) as follows: | | |
| 701. $                to | | |
| 702. $                to | | |
| 703. Commission paid at Settlement | | |
| 800. ITEMS PAYABLE IN CONNECTION WITH LOAN | | |
| 801. Loan Origination Fee        % Premier Financial Company | 2,752.82 | |
| 802. Loan Discount        % | | |
| 803. Appraisal Fee        to Premier Financial Company     (P.O.C.) 350.00 Buyer | | |
| 804. Credit Report | | |
| 805. Admin Fee        to Premier Financial Company | 250.00 | |
| 806. Doc Prep Fee        to New Century Mortgage Corporation | 359.00 | |
| 807. Flood Cert Fee        to New Century Mortgage Corporation | 11.20 | |
| 808. Tax Service Fee        to New Century Mortgage Corporation | 78.00 | |
| 809. Underwriting Fee        to New Century Mortgage Corporation | 350.00 | |
| 810. Processing Fee        to Premier Financial Company | 695.00 | |
| 811. YSP        to To PFC by NCMC        $1,200.00 POC by Lender | | |
| 900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE | | |
| 901. Interest From 12/27/2004 to 01/01/2005  @$ 25.4794 /day    5 Days | 127.40 | |
| 902. Mortgage Insurance Premium for        to | | |
| 903. Hazard Insurance Premium for        to | | |
| 904. | | |
| 905. | | |
| 1000. RESERVES DEPOSITED WITH LENDER FOR | | |
| 1001. Hazard Insurance        4 mo @$    57.50 /mo | 230.00 | |
| 1002. Mortgage Insurance        mo @$        /mo | | |
| 1003. City Property Taxes        5 mo @$    26.35 /mo | 131.75 | |
| 1004. County Property Taxes        mo @$        /mo | | |
| 1005. Annual Assessments        mo @$        /mo | | |
| 1006. Aggregate Analysis Adjustment  to New Century Mortgage Corporation | -26.49 | |
| 1100. TITLE CHARGES | | |
| 1101. Settlement or closing fee        to Pinnacle Title & Escrow Inc. | 375.00 | |
| 1102. Abstract or title search        to Pinnacle Title & Escrow Inc. | 250.00 | |
| 1103. Title examination        to Pinnacle Title & Escrow Inc. | 195.00 | |
| 1104. Title Insurance binder        to Pinnacle Title & Escrow Inc. | 35.00 | |
| 1105. Document Preparation | | |
| 1106. Notary Fees | | |
| 1107. Attorney's fees        to Pinnacle Title & Escrow Inc. | 395.00 | |
| (includes above items No: ) | | |
| 1108. Title Insurance        to Chicago Title Insurance Company | 450.00 | |
| (includes above items No: ) | | |
| 1109. Lender's Policy        120,000.00  - 450.00 | | |
| 1110. Owner's Policy | | |
| 1111. | | |
| 1112. Courier/Overnight/Misc.        to Pinnacle Title & Escrow Inc. | 75.00 | |
| 1113. | | |
| 1200. GOVERNMENT RECORDING AND TRANSFER CHARGES | | |
| 1201. Recording Fees Deed $ 26.50    : Mortgage $ 194.50   : Release $ | 221.00 | |
| 1202. City Transfer Tax        Deed $ 732.66   : Mortgage $ | 732.66 | |
| 1203. City Recordation Tax        Deed $ 732.66   : Mortgage $ | 732.66 | |
| 1204. County Transfer Tax        Deed $        : Mortgage $ | | |
| 1205. | | |
| 1300. ADDITIONAL SETTLEMENT CHARGES | | |
| 1301. Survey | | |
| 1302. Pest Inspection | | |
| 1303. Release Procurement/Prep        to Pinnacle Title & Escrow Inc. | | |
| 1304. 2004 Property Taxes        to D.C. Treasurer | 124.37 | |
| 1305. Payoff        to DC Child Support | 17,357.00 | |
| 1306. Payoff        to Amex | 7,720.00 | |
| 1307. Payoff        to Navy FCU | 2,764.00 | |
| 1308. | | |
| 1400. TOTAL SETTLEMENT CHARGES      (enter on lines 103, Section J and 502, Section K) | 36,385.37 | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Emma Cunningham

Johnny Cunningham

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause funds to be disbursed in accordance with this statement.

Settlement Agent    Date  12/20/04

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U. S. Code Section 1001 and Section 1010.

## Uniform Settlement Statement Addendum

File No.   04-17821NT                                                    Date:  December 20, 2004

This page is attached to and made a part of the SETTLEMENT STATEMENT in the matter of the conveyancing to the BORROWER(S) who are signing for the loan being made by the LENDER named and shown on Page 1 of the two (2) page form HUD-(REV 5/76) attached hereto and which this is made a part thereof with the said SETTLEMENT STATEMENT also showing the date and place of the settlement and the property encumbered by the aforesaid loan.

IN REFERENCE TO THE ABOVE CASE, it is understood and agreed by said the undersigned that there is no attorney-client relationship between the BORROWER(S) and with Pinnacle Title and Escrow Inc. and that the relationship which exists is for the purpose of the examination of title; for the issuance of title insurance; and for the conducting of settlement services in connection with the above referenced loan secured by the aforesaid described real property; except, as specifically stated otherwise in writing, and that this firm, when title examination is made, takes no liability for matters not appearing of record during the period of the requested search.

The BORROWER(S) also hereby acknowledge notification that Pinnacle Title and Escrow Inc., as a duly licensed agent of the title insurer, Chicago Title Insurance Company, pursuant to the provisions of Section 22-102 Insurance Article of the Annotated Code of Maryland, is entitled to receive commission of the title insurance premium to be paid by the company issuing the title insurance policy involved in the settlement of the loan described on Page 1. The refinancing BORROWER(S) state under the penalties of perjury that there are no other deeds of trust, mortgages, special assessments levied or pending or other liens or other unpaid bills or judgements affecting the property other than those shown on the Settlement Statement (and those listed are true and correct) and the BORROWER(S) hereby guarantee prompt and immediate payment and release and full satisfaction of the same.  The parties hereby understand and agree that the accuracy of information furnished to Pinnacle Title and Escrow Inc. , as to insurance; taxes; assessments; principal and interest on existing or assumed deeds of trust, mortgages and/or on other evidences of indebtedness, if any; water and sewer charges; escrow funds; and similar items are not guaranteed by said Pinnacle Title and Escrow Inc.or any of its employees although every effort is made to ascertain this information accurately.

It is understood and agreed that Pinnacle Title and Escrow Inc. assumes no liability, express or implied, for notices of and or actual violations of governmental orders or requirements, if any, issued by any departments, office, or other authority of local, State, County or Federal government as to ownership, occupancy, zoning and or similar laws, regulations and/or ordinances.  The BORROWER(S) understand that the executed settlement documents are being held in escrow and that settlement is not complete until the following requirements for settlement are satisfied: 1. All checks and/or wired funds are received and cleared. 2. Where Hazard Insurance is required by the Lender, the Hazard Insurance Policy and Paid Receipt are to be received at the lender's office. 3. Where a satisfactory Termite Report is required by the Lender, the satisfactory Termite Report is to be received at the lender's office and/or where a satisfactory Well and/or Septic Certification is required by the Lender, the satisfactory Well and/or Septic Certification is to be received at the lender's office. 4. All lender's requirements are fulfilled. 5. Oral assumption payoff figures are verified or written assumption payoff figures are received. 6. Assignment of funds checks are received and cleared. 7. Prior to the recording of all insured instruments, receipt by Pinnacle Title and Escrow Inc. of a clear title rundown from the abstractor named on page 2 of the attached HUD-1 or from the provider of recording services for Pinnacle Title and Escrow Inc. and acceptance and recordation of all required documents by the appropriate governmental agency.

ADJUSTMENTS:
Cash from/to Borrower from Settlement Statement - Line 300                            $ _____
_____                                $ _____
_____                                $ _____
_____                                $ _____
_____                                $ _____
Line 300 Cash to/from Purchasers for Settlement as Amended                            $ _____

I/We have reviewed the HUD-1 Settlement Statement and to the best of my/our knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my/our account or by me/us in this transaction.  I/We hereby approve and acknowledge receipt of the Uniform Disclosure/(HUD) Settlement Statement.

BORROWER

*Emma F. Cunningham*
Emma Cunningham

*John A. Cunningham*
John A. Cunningham

The HUD-1 Settlement Statement which Pinnacle Title and Escrow Inc. have prepared is a true and accurate account of this transaction.  Pinnacle Title and Escrow Inc. has caused or will cause the funds to be disbursed in accordance with this statement.

By: _____                          Date: December 20, 2004
        David M. Maged

**Pinnacle Title and Escrow Inc.**
**51 Monroe Street, Suite 1505, Rockville, MD 20850**
**Phone: 301-424-5400   FAX: 301-424-6896**

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

Civil Division

EMMA CUNNINGHAM by her          *       ATTORNEY'S FILE COPY
Conservator, Robert Bunn
910 17th Street, NW, Suite 800
Washington, DC  20006

    Plaintiff,
                                                            5744
                                *       Civil No. 05-0005714
                                        Real Property: J. Campbell
v.                              *       Next Event: Initial Conference
                                *              October 28, 2005 @ 9:30
NEW CENTURY MORTGAGE CORP.      *
18400 Van Karmon Avenue, Suite 1000
Irvine, CA  92612

    Serve: Chuch Houston, VP
    New Century Mortgage Corp.

and
                                        ┌────────────────────────────┐
STEPHEN F.J. ORNSTEIN, Esq.             │        RECEIVED            │
1700 Pennsylvania Ave., N.W.            │   CIVIL CLERK'S OFFICE      │
Suite 800                               │                            │
Washington, DC  20006-4704              │       AUG 1 8 2005         │
                                        │                            │
and                                     │      SUPERIOR COURT        │
                                        │ OF THE DISTRICT OF COLUMBIA│
SAXON MORTGAGE SERVICES, INC.           │      WASHINGTON, DC        │
4708 Mercantile Drive North             └────────────────────────────┘
Ft. Worth, TX  76137-3605

and

PREMIER FINANCIAL COMPANY
10610 Rhode Island Avenue, Suite 204
Beltsville, MD  20705

and

JOHN CUNNINGHAM
6858 West Forest Road
Hyattsville, MD 20785

and

PINNACLE TITLE AND ESCROW, INC.
51 Monroe Street, Suite 1505
Rockville, MD 20850

and

UNKNOWN ASSIGNEE LENDER or
SECURITIZATION TRUST

      Defendants.                *

## ANSWER OF DEFENDANT, PINNACLE TITLE AND ESCROW, INC. TO COMPLAINT

COMES NOW Defendant, Pinnacle Title and Escrow, Inc., by and through

counsel, Leo A. Roth, Jr., Esquire and Brault Graham, P.L.L.C., and in Answer to the

Complaint filed herein, states as follows:

### FIRST DEFENSE

In specific response to the allegations of the Complaint, this Defendant states as

follows:

### JURISDICTION

1.    Admitted.

### PARTIES

1.    Defendant is without sufficient information at this time to either admit or deny

this paragraph, therefore, strict proof is demanded.

2.-7.    The allegations in these paragraphs are specifically directed to the co-defendants

and as such will be answered by these parties. If any allegations made in these paragraphs are directly or indirectly intended to be made against this Defendant, then same are denied and strict proof is demanded.

8.      Admitted.

9.      This Defendant is without information or belief to admit or deny these allegations and therefore same are denied and strict proof is demanded.

### III.    FACTS

1-22.   The allegations in these paragraphs are specifically directed to the co-defendants and as such will be answered by these parties. If any allegations made in these paragraphs are directly or indirectly intended to be made against this Defendant, then same are denied and strict proof is demanded.

23-25. Denied.

26-31. The allegations in these paragraphs are specifically directed to the co-defendants and as such will be answered by these parties. If any allegations made in these paragraphs are directly or indirectly intended to be made against this Defendant, then same are denied and strict proof is demanded

### IV.    REQUESTED RELIEF

The requested relief contained in Counts One and Two under the requested releif section are not directed to this Defendant. If these requests are directed to this Defendant, then this Defendant denies that Plaintiff is entitled to the relief requested herein.

With respect to the damages and costs demanded in Count III of the requested relief section, then it is denied that Plaintiff is entitled to the relief requested against this Defendant.

Count IV of the requested relief section does not demand any relief against this Defendant, therefore no response is required.

Count V of the requested relief section does not demand any relief against this Defendant, therefore no response is required.

Count VI of the requested relief section does not demand any relief against this Defendant, therefore no response is required.

### SECOND DEFENSE

The Complaint fails to state a cause of action against this Defendant upon which relief can be granted.

### THIRD DEFENSE

Anything not admitted is denied.

Respectfully submitted,

BRAULT GRAHAM, P.L.L.C.

LEO A. ROTH, JR., #11064
110 South Washington Street
Rockville, MD 20850
(301) 424-1060
Counsel for Pinnacle Title and Escrow, Inc.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of August 2005, a copy of the foregoing **Answer of Defendant, Pinnacle Title and Escrow, Inc.**, was mailed, via first class mail, postage prepaid, to :

Robert Bunn, Esquire
910 17th Street, N.W., Suite 800
Washington, DC 20006-2606
Conservator for Emma Cunningham

Chuck Houston, VP
New Century Mortgage Corporation
18400 Van Karmon Avenue, Suite 1000
Irvine, CA 92612

Stephen F. J. Ornstein, Esquire
1700 Pennsylvania Ave., N.W., Suite 800
Washington, DC 20006-4704

Saxon Mortgage Services, Inc.
4708 Mercantile Drive North
Ft. Worth, TX 76137-3605

Premier Financial Company
10610 Rhode Island Avenue, Suite 204
Beltsville, MD 20705

John Cunningham
6858 West Forest Road
Hyattsville, MD 20785


LEO A. ROTH, JR.

FILED
CIVIL ACTIONS BRANCH

AUG 1 0 2005

Superior Court
of the District of Columbia
Washington, D.C.

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### Civil Division

EMMA CUNNINGHAM,                    *

                    Plaintiff,    *    Civil Action No.: 05-CA-005744
                                      J. Campbell

v.                                  *

NEW CENTURY MORTGAGE              *    <u>Next Event</u>:  Initial Conference
CORPORATION, *et al.*,                                  October 28, 2005 at 9:30 a.m.
                              *

                Defendants.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## ANSWER OF DEFENDANT PREMIER FINANCIAL COMPANY

COMES NOW Defendant Premier Financial Company ("Premier"), by its undersigned attorneys, and files herein this Answer to Plaintiff's Complaint and states as follows:

1.      Premier generally denies each and every paragraph, allegation, and Count of Plaintiff's Complaint.

2.      In defense of Count I of Plaintiff's Complaint, seeking declaratory relief, Premier states that this Count does not make an allegation against it which requires Premier to file an answer. To the extent Count I asserts a claim against Premier, Premier states as follows:

        a.    <u>First Defense</u>: Plaintiff's Complaint fails to state a cause of action against Premier upon which relief may be granted.

        b.    <u>Second Defense</u>: Premier raises all available defenses pursuant to the law of contracts.

167002_1.DOC



c.    Third Defense:  Any fraud alleged by Plaintiff is the result of acts or omissions by persons over which Premier had no control or any right of control.

d.    Fourth Defense:  Any injury alleged by Plaintiff is the result of acts or omissions by persons over which Premier had no control or any right of control.

e.    Fifth Defense: Premier raises the defense of acceptance.

Premier reserves the right to assert additional defenses as more information is learned during the course of discovery.

3.    In defense of Count II of Plaintiff's Complaint, seeking injunctive relief, Premier states as follows:

a.    First Defense: Plaintiff's Complaint fails to state a cause of action against Premier upon which relief may be granted.

b.    Second Defense:  Premier raises all available defenses pursuant to the law of contracts.

c.    Third Defense:  Any fraud alleged by Plaintiff is the result of acts or omissions by persons over which Premier had no control or any right of control.

d.    Fourth Defense:  Any injury alleged by Plaintiff is the result of acts or omissions by persons over which Premier had no control or any right of control.

e.    Fifth Defense: Premier raises the defense of acceptance.

f.    Sixth Defense: Plaintiff is not entitled to injunctive relief inasmuch as an adequate remedy exists at law.

Premier reserves the right to assert additional defenses as more information is learned during the course of discovery.

4.    In defense of Count III of Plaintiff's Complaint, seeking damages and costs, Premier states as follows:

a.    First Defense: Plaintiff's Complaint fails to state a cause of action against Premier upon which relief may be granted.

b.    Second Defense: Premier raises all available defenses pursuant to the law of contracts.

c.    Third Defense: Any fraud alleged by Plaintiff is the result of acts or omissions by persons over which Premier had no control or any right of control.

d.    Fourth Defense: Any injury alleged by Plaintiff is the result of acts or omissions by persons over which Premier had no control or any right of control.

e.    Fifth Defense: Defendants raise the defense of acceptance.

f.    Sixth Defense: Plaintiffs have not sustained any damage or injury caused by Premier or any other Defendant.

Premier reserves the right to assert additional defenses as more information is learned during the course of discovery.

5.    In defense of Count IV of Plaintiff's Complaint, alleging Truth In Lending Act violation, Premier states that this Count does not make an allegation against it which requires Premier to file an answer.

6.    In defense of Count V of Plaintiff's Complaint, alleging a violation of the District of Columbia Usury Act, Premier states that this Count does not make an allegation against it which requires Premier to file an answer.

167002_1.DOC

3

7. In defense of Count VI of Plaintiff's Complaint, seeking other relief, Premier states that this Count does not make an allegation against it which requires Premier to file an answer.

WHEREFORE, Defendant Premier Financial Company, having fully answered Plaintiff's Complaint, requests an Order and Judgment dismissing the Complaint; awarding its costs, attorneys' fees and expenses; and granting such other relief as the Court may deem just and appropriate.

Respectfully submitted,

Timothy J. Capurso
D.C. Bar # 485198

GORDON, FEINBLATT, ROTHMAN,
  HOFFBERGER & HOLLANDER, LLC
The Garrett Building
233 East Redwood Street
Baltimore, Maryland 21202
Tel: 410-576-4000
Fax: 410-576-4026

Of Counsel:
Brian L. Moffet
GORDON, FEINBLATT, ROTHMAN,
  HOFFBERGER & HOLLANDER, LLC
The Garrett Building
233 East Redwood Street
Baltimore, Maryland 21202

**Attorney for Defendant Premier Financial
Company**

167002_1

4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the _16th_ day of August, 2005, a copy of

the foregoing Answer was mailed, first-class, postage prepaid to:

Robert Bunn
910 17th Street, NW
Washington, D.C. 20006
Attorney for Plaintiff

New Century Mortgage Corporation
c/o Chuck Houston, Vice President
18400 Van Karmon Avenue
Suite 1000
Irvine, California 92612

Stephen F.J. Orenstein, Esquire
1700 Pennsylvania Avenue, N.W.
Washington D.C. 20006-4704

Saxon Mortgage Services, Inc.
4708 Mercantile Drive North
Ft. Worth, Texas 76137-3605

John Cunningham
6858 West Forest Road
Hyattsville, Maryland 20785

Pinnacle Title and Escrow, Inc.
51 Monroe Street
Suite 1505
Rockville, Maryland 20850

Timothy J. Capurso

5



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

EMMA CUNNINGHAM

Vs.                                                    C.A. No.      2005 CA 005744 R(RP)

NEW CENTURY MORTGAGE CORPORATION

## INITIAL ORDER

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case is assigned to the judge designated below. All future filings in this case shall bear the name of the judge currently assigned to the case beneath the case number in the caption. Upon the filing of any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of service on each defendant: copies of the Summons, the Complaint, and this Initial Order, and any General Order issued by the judge to whom the case is assigned. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive reading. As to the defendant who has failed to respond, a default will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge as an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

Chief Judge Rufus G. King, III

Case Assigned to: Judge JOHN M CAMPBELL
Date:        July 25, 2005
Initial Conference: 9:30 am, Friday, October 28, 2005
Location:  Courtroom 517
           500 Indiana Avenue N.W.
           WASHINGTON, DC 20001